1  Steven F. Werth (CA Bar No. 205434)
    *steven.werth@gmlaw.com*
2  **GREENSPOON MARDER LLP**
    1875 Century Park East, Suite 1900
3  Los Angeles, California 90067
    Telephone: 213.626.2311
4  Facsimile: 954.771.9264

5  Attorneys for Howard M. Ehrenberg,
    Chapter 7 Trustee

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11  In re:                          Case No. 2:21-bk-16403-VZ

12  SPECTRUM LINK, INC.,            Chapter 7

13          Debtor.                 Adversary No.: 2:23-ap-01354-VZ

14  ─────────────────────────       **FIRST AMENDED COMPLAINT TO**
                                    **RECOVER AVOIDABLE TRANSFERS**
15  HOWARD M. EHRENBERG, Chapter 7
    Trustee,                        Place:    Courtroom 1368
16                                            Hon. Vincent P. Zurzolo
            Plaintiff,                        255 East Temple Street
17                                            Los Angeles, CA 90012
        vs.
18
    BHANU V. PATEL, aka BAHNU PATEL,
19  an individual,

20          Defendant.

21          Plaintiff Howard M. Ehrenberg, solely in his capacity as the chapter 7 trustee

22  ("Trustee") of Spectrum Link, Inc. ("Debtor") brings this adversary proceeding against

23  Bhanu V. Patel, aka Bahnu Patel, an individual ("Defendant"), whom the Trustee

24  incorrectly named in his initial complaint in this adversary proceeding as "Bahnu Patel,"

25  and alleges as follows:

26                          **INTRODUCTION**

27      1.      This suit seeks to recover transfers made by AWB Consulting LLC, a

28

SFW 55613132v1

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

California limited liability company ("AWB") to Defendant, on the basis that the monies originated as an avoidable fraudulent transfer from Debtor to AWB.  In the four-year period prior to August 11, 2021 (the "Petition Date"), the date the Debtor commenced this bankruptcy case, the Debtor made transfers to AWB totaling $530,598.25.  These are referred to as the "Initial Transfers".  The principal of AWB, Mr. William Walter Wright ("Mr. Wright"), deposited these monies into AWB's account at Wells Fargo with the last four digits 7496 ("Account 7496").  During that same four-year period, AWB transferred $138,570 to Defendant from Account 7496.  These transfers—all by check to "Bahnu Patel" are identified more fully in paragraphs 46-48 below by date and amount, and are referred to in this Complaint as the "Four-Year Transfers".

2.     The Trustee has commenced an adversary proceeding to avoid and recover the Initial Transfers from AWB, which adversary proceeding is pending before this Court, captioned *Howard M. Ehrenberg v. William Walter Wright, et al.*, Case No. 2:23-ap-01165-VZ (the "Wright Adversary").  Pursuant to 11 U.S.C. §550(a), should the Initial Transfers be avoided as intentional fraudulent transfers, the Trustee can recover the transfers subsequently made to the Defendant.  The Four-Year Transfers appear to have been made to pay the lease owed by Mr. Wright and his wife Amy Barrows-Wright, for a house located at 23130 Valerio Street, West Hills, California 91303 (the "Valerio Property"), which Mr. Wright and his wife leased until they purchased their current home in December, 2021.  Defendant appears to have owned the Valerio Property.

3.     The Debtor made the Initial Transfers as part of a fraudulent scheme involving the sale and leaseback of radio antennas that caused the loss of tens of millions of dollars to more than one hundred unsuspecting investors.

4.     The Debtor made the Initial Transfers with the actual intent to hinder, delay, and defraud the Debtor's creditors.  The Debtor's creditors consisted primarily of individuals whom the Debtor convinced to purchase one or more antenna towers, at $25,000 per tower, that the Debtor would then lease back from the investor, as part of the Debtor's business of providing Internet service in certain large U.S. cities.  A Youtube

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1   video posted May 4, 2021, in which Mr. Wright, who was the Debtor's General Manager,

2   explains this investment opportunity, is at *www.youtube.com/watch?v=d7Cxbk05JxA*.

3       5.      The Debtor did not generate sufficient revenue to repay its investors, and

4   relied on new investment money to make interest payments to old investors, as well as to

5   pay its operating expenses.  The Debtor transferred a substantial amount of inventor money

6   to insiders, either directly as is the case with Mr. Wright and AWB, or to third parties to

7   pay debt incurred by insiders for which the Debtor was not responsible.  The Debtor also

8   transferred investor money to third parties to maintain the illusion that it was a legitimate

9   business.  This enabled the Debtor to lull additional investors into making new

10  investments.  The Debtor also made payments to certain investors to keep them from

11  complaining, or commencing legal action.

12      6.      The Trustee requests that this Court grant relief that will return the Four-

13  Year Transfers to the Debtor's estate ("Estate").  The Trustee seeks recovery of the Four-

14  Year Transfers under 11 U.S.C. § 550.

15                          **JURISDICTION AND VENUE**

16      7.      This is an adversary proceeding, pursuant to Federal Rule of Bankruptcy

17  Procedure, which relates to the Chapter 7 proceeding captioned In re Spectrum Link, Inc.,

18  Case No. 2:21-bk-16403-VZ  (Bankr. C.D. Cal., Los Angeles Division).

19      8.      This Court has subject matter jurisdiction over this action pursuant to section

20  28  U.S.C. § 1334(b) and 28 U.S.C. § 157(a), in that this adversary proceeding arises in,

21  arises under, and/or relates to Debtor's chapter 7 case.

22      9.      This adversary proceeding is a core proceeding under section 157(b)(2) of

23  Title 28 of the United States Code, such that this Court has jurisdiction to hear and

24  determine this proceeding and to enter an appropriate order and judgment.  The Trustee

25  consents to entry of a final order or judgment by this Court.

26      10.     This Court is the proper venue for this adversary proceeding pursuant to 28

27  U.S.C. § 1409(a) because the Debtor's chapter 7 case is pending in this judicial district.

28

**PARTIES**

11.     The Trustee is the duly appointed, authorized, and acting Chapter 7 Trustee for the Estate.  The Debtor commenced a voluntary bankruptcy case under Chapter 11 of the United States Code (the "Bankruptcy Code") on August 11, 2021.  Howard M. Ehrenberg was initially appointed Chapter 11 Trustee of the Estate on November 20, 2021. Subsequently, the Court converted this case to one under Chapter 7 of the Bankruptcy Code.  The Trustee was appointed as Chapter 7 Trustee of the Estate on December 23, 2021, and he has served in that capacity since.

12.     During the Four-Year Period, Mr. Wright did business under various names, and opened various bank accounts at Wells Fargo Bank. National Association ("Wells Fargo") into which he deposited money.  One of those accounts was Account 7496, in the name of "AWB Consulting LLC".  AWB is not a party to this proceeding.  It is one of the defendants in the Wright Adversary.  AWB was the intermediary between the Initial Transfers and the Four-Year Transfers.

13.     Defendant is an individual who owns the Valerio Property, located at 23130 Valerio Street, West Hills, California 91303.  After filing his initial complaint in this action on July 5, 2023, and identifying the Defendant's name as "Bahnu Patel", the Trustee realized that the name "Bahnu Patel," while written on all of the checks written to Defendant, was not Defendant's actual name.

**GENERAL ALLEGATIONS**

**I.  Debtor's Operations**

14.     Bernard Mayfield ("Mr. Mayfield") formed the Debtor on October 10, 2013. At all relevant times, Mr. Mayfield was the 100% equity interest holder in the Debtor.  He served as its President and Chief Executive Officer until his death in April, 2021.

15.     In 2014, Mr. Mayfield asked his sister, Marilyn Adjangba ("Ms. Adjangba"), to work at the Debtor.  Ms. Adjangba worked at the Debtor through 2021, becoming its Chief Operating Officer upon Mr. Mayfield's death.  She did not have a title prior to April, 2021.  Mr. Mayfield also asked Mr. Wright and Mr. Michael Micheletti to work at the

**GREENSPOON MARDER LLP**
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1   Debtor.  Mr. Wright's title was General Manager.  Mr. Micheletti held various titles

2   including Chief Operating Officer and Chief Technology Officer.  Dr. Alex Mukathe, the

3   Debtor's designated agent upon its formation, prepared the Debtor's tax returns.

4        16.    As part of the Debtor's efforts to solicit new investment, from time to time

5   Mr. Mayfield, Mr. Micheletti, and Mr. Wright participated in video interviews with third

6   parties such as Mountain West IRA.  In those videos, Mr. Mayfield, Mr. Micheletti, and

7   Mr. Wright explained the Debtor's business and promoted investing in antenna towers.  In

8   certain videos, Mr. Wright referred to himself as "Bob Davis".  In others, he referred to

9   himself as "Wally Wright".  Mr. Wright also participated in video interviews on his own,

10   such as the video identified in paragraph 5.

11        17.    The Debtor's pitch to investors was this:  for every $25,000 invested, the

12   Debtor would use that money to:  (i) purchase a radio antenna on behalf of the investor,

13   which the investor would then own, (ii) install that antenna on property the Debtor had

14   previously leased from a third party, (iii) obtain a license from the FCC in the name of the

15   investor to use a certain radio frequency at that particular location, (iv) lease both the

16   antenna and the FCC license from the investor, for $500 per month, and (v) use that

17   antenna and license to provide Internet service to paying customers.  The Debtor

18   guaranteed that any investor could leave the investment at any time, and receive a full

19   buyback of its initial investment.

20        18.    The Debtor's pitch attracted numerous investors.  One investor, Kenneth

21   Thieman, began investing with the Debtor in 2014.  Others invested in 2015 and 2016.

22   From February 1, 2017, through December 31, 2017, investors transferred $4 million to

23   the Debtor—160 towers.  In 2018, investors transferred $3.2 million to the Debtor.  In

24   2019, $4.6 million.  In 2020, $3.9 million.

25        19.    The Debtor did obtain FCC licenses for some investors, which identified

26   latitude and longitude coordinates that allowed the investor to broadcast at a specific

27   bandwidth range at that location.  The Debtor also leased roof spaces from third parties,

28   and acquired some antennas to place on those roofs.  The Debtor also had some customers,

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1   mostly small businesses, who paid the Debtor monthly for internet use.  From February 1,

2   2017, through December 31, 2017, the Debtor's gross income from those customers was

3   $140,000.  In 2018, the Debtor grossed $190,000.  In 2019, its gross income was $240,000.

4   In 2020, $256,000.  That income was not sufficient to pay operational expenses and make

5   lease payments at $500 per month per tower.  Considering solely the 160 towers purchased

6   in 2017, the Debtor's monthly leaseback obligation was $80,000.  The Debtor's gross

7   monthly revenue from customers never exceeded $40,000, ever.  The only way the Debtor

8   could pay old investors was to obtain money from new investors.

9       20.    The Debtor was a Ponzi scheme.  It obtained substantially all of its "revenue"

10  from new investments, with only a small percentage coming from customers paying for

11  internet service.  The Debtor's 2018 tax return, which reported income of $3,091,834, was

12  simply a total of all deposits made into the Debtor's primary investment account at First

13  Bank, Account No. x0438 ("Account 0438").  This not only treated investor deposits as

14  pure income, but failed to account for actual customer revenue deposited into the Debtor's

15  other bank accounts:  Chase Bank Account Nos. x6183, x2736, and x3932.  In 2018,

16  investor deposits totaled $3,205,000.  Customer revenue totaled only $190,000.

17      21.    In 2018, customer revenue accounted for only 5.6% of all deposits being

18  made into the Debtor's accounts.  That percentage is lower for both 2017 and 2019.  In

19  2020, it was 6.1%.  A graphical representation of investments versus revenue is below:

20

21

22

23

24

25

26

27

28

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264



22.    Mr. Mayfield, Ms. Adjangba, Mr. Micheletti, and Mr. Wright did not operate the Debtor as a legitimate business.  Nevertheless, the Debtor did have some expenses which it paid in order to appear legitimate.  It leased office space, which Mr. Mayfield used to pitch to potential investors.  It had employees.  It purchased office supplies.  It made lease payments to investors.  But those payments were minor compared to the transfers the Debtor made to or for the benefit of insiders, including Mr. Wright and numerous family members of Mr. Mayfield.  The Trustee seeks to avoid all such transfers—including the Initial Transfers by way of the Wright Adversary—that fall into that category, specifically transfers made to parties who either (i) provided the Debtor with no reasonably equivalent value in exchange, or (ii) did not take the transfers in good faith.

**II.    The Fraud**

23.    Prior to founding the Debtor, Mr. Mayfield worked at company in Texas that licensed radio frequencies from the U.S. government to re-sell on the private market, for the purposes of redistributing cell phone uses across the radio spectrum.  Mr. Mayfield used his familiarity with that industry to defraud investors of the Debtor.

24.    Mr. Mayfield used an attorney, Mr. Holt Smith, to modify contracts that Mr. Mayfield had used in his former business, for use in the Debtor's fraudulent scheme.

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1   These documents gave the veneer of legitimacy.  The Debtor entered into

2   "Telecommunications Lease Agreements" with each investor, which promised a certain

3   rate of return in exchange for an investment.  A "Spectrum Link Corporation Services And

4   Purchase Agreement" stated that the Debtor would purchase an antenna, install it, and also

5   submit an application to the FCC to obtain a license to use a certain millimeter wave

6   frequency.  Some investors received a GHz Registration form.  A "12 Month Service

7   Guarantee" promised a full refund to the investor, if the Debtor did not carry out its

8   obligations.  The Debtor also provided some investors with Sub-License Agreements

9   between the Debtor and third parties, demonstrating that the Debtor had the right to place

10  an antenna at a certain roof location.

11      25.     What the Debtor did not provide to investors was confirmation that an actual

12  antenna existed, at a specific location, that corresponded with the latitude and longitude

13  coordinates specified in the FCC license.  The antennas that investors supposedly

14  "purchased" either did not exist, or the Debtor oversold to multiple investors.  Some

15  investors became suspicious, and demanded their money be returned.  For investors who

16  purchased only one or two antennas, the Debtor might agree to repurchase the antennas.  It

17  could not always do so.  Mr. Mayfield encouraged some protesting investors to sign a

18  "Mutual Recission and Release Agreement" and a "Sell Permission Agreement," meant to

19  further push back the deadline by which the Debtor had to return the investors' principal.

20      26.     Some investors commenced legal action, seeking to enforce the terms of

21  their contracts.  Typically, these were investors who had purchased so many towers that

22  the Debtor could not have repurchased them if it wanted to.  Kenneth Thieman filed a

23  complaint in May, 2021, asserting that he invested $900,000 between 2014 and 2016:  36

24  towers, for a monthly lease obligation of $18,000.  The highest gross monthly income the

25  Debtor ever averaged in a calendar year--in 2020--was $21,314.  The Debtor did not

26  generate sufficient proceeds, at any point, to both operate and pay this single investor.  The

27  Debtor had more than 100 investors.

28      27.     In early 2018, the Debtor's fraudulent scheme almost collapsed; new

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1    investment suddenly dried up.  Mr. Mayfield, promoting a new business venture called

2    Spectrumlink Entertainment, Inc. and a music festival called "Lost in Paradise," obtained

3    $972,500 in investor financing in April, 2018—more than the Debtor had ever received in

4    a single month.  Investments then plummeted—visible on the graph in paragraph 22.  Over

5    the next seven months, the Debtor averaged less than $100,000 per month in tower

6    purchases.  With gross monthly customer revenue averaging $16,500 at that time, the

7    fraudulent scheme no longer made enough to pay old investors.  In July, 2018, Mr.

8    Mayfield wrote his investors a letter, stating that lease payments would cease, with no

9    estimated restart date.

10        28.    For many of the Debtor's old investors, regular payments never did resume.

11    Mr. Mayfield eventually began making payments to some, but at one-third the normal

12    amount per tower:  $166.66 per month.  Mr. Mayfield and Mr. Wright—concealing the

13    fact that the Debtor had ceased payments on old investments--successfully convinced new

14    victims to invest.  The Debtor did not fold in 2018.

15        29.    In 2019, the Debtor obtained another $4.6 million in investments, with $1

16    million coming from a single investor.  The Debtor's 2019 revenue from customers was

17    $240,000--a slight increase, but nowhere close to enough to make lease payments.  From

18    February, 2017, through December, 2019, the Debtor received $11,780,597 in investor

19    money:  471 towers.  The monthly expense on that debt was $235,000—the Debtor's

20    approximate gross revenue for all of 2019.  The Debtor's monthly lease obligations could

21    be paid only by new investment, which continued to flow.  From January, 2020, until Mr.

22    Mayfield's death, investors deposited an additional $5 million.  After Mr. Mayfield's death,

23    no further material investments came in.  The Debtor declared bankruptcy in August, 2018.

24    At the time of its filing, it had $72.00 in its bank account.

25        30.    At all relevant times, Mr. Mayfield deposited investor money into Account

26    0438.  Customer revenue came into various accounts, but after May 1, 2018, exclusively

27    into Chase Account 3932.  After May 1, 2018, the Debtor transferred cash as follows:  (i)

28    Account 0438 to insider-related transferees (all of the Initial Transfers came from this

account), (ii) Account 0438 to Account 3932, (iii) Account 3932 to employees, (iv) Account 3932 to investors, and (v) Account 3932 to miscellaneous third parties. The balance of Account 0438 fluctuated wildly, depending on the amount of investor deposits. During a two-month period in 2018, it dropped by $1 million. The balance of Account 3932 remained steady. It received regular transfers from Account 0438 of just enough to cover expenses.

31.     Mr. Mayfield used Account 0438 to transfer large amounts of funds to insiders. During the Four-Year Period, he personally withdrew more than $900,000 in cash and cashier's checks, paid $300,000 as a deposit for a residence located at 712 S. Lost Canyon Road in Anaheim Hills, California (the "Anaheim Property"), and paid credit cards issued to him personally, totaling more than $1 million. He made significant transfers to family members, including the mothers of certain of his children: Iris Berdugo ($210,000 including rent payments), and Jasmine Archie ($380,000, including rent payments and car lease).

32.     Despite telling investors that there was not enough money to pay them their monthly lease payments, Mr. Mayfield signed a lease in July, 2020, for a brand new Ferrari, valued at more than $200,000, using $15,000 of the Debtor's money to fund the down payment, and committing the Debtor to make monthly lease payments of nearly $3,000. Those payments continued through September, 2021—after the Petition Date. Mr. Mayfield also used Debtor's money to pay the lease on a Rolls Royce Dawn through March 2021 (approximately $4,000 per month), and a 2014 Bentley for a certain Dr. Kain Kumar through February, 2021 ($3,000 per month), despite Mr. Kumar being sentenced to a two-year prison term for Medicare fraud on January 6, 2020.

33.     Mr. Mayfield made his largest non-family payments to Mr. Micheletti and Mr. Wright. During the Four-Year Period, Mr. Micheletti received $402,500 through his company Micheletti Consulting. Dr. Mukathe received $80,000. Mr. Wright did not receive payments in his name. Instead, he received payments as follows: (i) "Bob Davis" received $14,750, (ii) AWB received $530,598.25, which Mr. Wright deposited into

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1   Account 7496, (iii) Enumah received payments as "Enumah Group" or as "Enumah Group

2   Bob Davis" in the amount of $596,200.75, and (iv) Mr. Wright received payments as

3   "Global Distribution Group", in the total amount of $170,873.  The Debtor paid Mr.

4   Wright approximately $1.3 million during the Four-Year Period.

5       34.    The Debtor's fraud was unsustainable.  From February, 2017, through April,

6   2021, investors paid $16,850,000 to the Debtor---674 purported towers.  The monthly

7   payment on that debt--$337,000—was more than the gross revenue Debtor had made in

8   any year of its operation.  The fraudulent scheme collapsed in April, 2021.

9       35.    On April 1, 2021, Mr. Mayfield was admitted into Placentia Linda Hospital

10   in Orange, California with complications from Covid-19.  His health did not improve.  On

11   April 7, Mr. Mayfield signed over power of attorney to Ms. Adjangba.  On April 9, Mr.

12   Mayfield signed his last check on behalf of the Debtor.  Ms. Adjangba forged Mr.

13   Mayfield's signature on two more checks over the next ten days, to transfer funds from

14   Account 0438 to Account 3932.  On April 19, 2021, Mr. Mayfield died.  Ms. Adjangba

15   sent a letter out to investors the next day, informing them of Mr. Mayfield's death.

16       36.    The Debtor's business activity slowed significantly:  from May, 2021,

17   onward, the Debtor received only $37,350 from investors.  Ms. Adjangba transferred

18   $20,000 to Mr. Wright in April, 2021, but largely ceased paying other expenses.  With no

19   funds coming in except customer revenue—not enough to operate—bankruptcy loomed.

20       37.    Ms. Adjangba and Roger Jefferson, the Debtor's Vice-President of

21   Operations, met with bankruptcy counsel Michael Berger on June 4, 2021.  On July 14,

22   2021, Ms. Adjangba met again with Mr. Gary Baddin, who worked with Michael Berger.

23   In that meeting, Ms. Adjangba informed Mr. Baddin that Mr. Mayfield may have

24   embezzled $3,676,000 from the Debtor.  This was true, of course, because Ms. Adjangba

25   had personal knowledge that Mr. Mayfield used Debtor's funds to benefit her family

26   members.

27       38.    The Los Angeles Sheriff seized the Debtor's bank accounts in July, 2021,

28   taking $40,000 in cash.  The Debtor filed its bankruptcy case on August 11, 2021.

**GREENSPOON MARDER LLP**
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

### III.  The Trustee's Investigation

39.      Upon his appointment, the Trustee investigated the Debtor and the transfers made by the Debtor during the Four-Year Period.  Specifically, the Trustee obtained and reviewed all bank statements in the Four-Year Period in the name of the Debtor at First Bank (Account 0438, although the Trustee recently learned of two prior-existing First Bank accounts that had nominal activity) and Chase Bank Accounts 2721, 6183, 2736, 3932, 3957, and 5023.  Of these last accounts, accounts 3957 and 5023 had no material activity.  Chase Account 6183, opened in January, 2016, was used as the Debtor's primary operating account until May, 2018, then closed and Account 3932 became the primary operating account.

40.      The Trustee determined as part of this investigation that the Debtor made transfers to four broad categories of transferees.  First, the Debtor made payments to investors.  Second, the Debtor made payments to third parties for expenses necessary to maintain the illusion that the Debtor was a legitimate business:  office leases, rooftop leases, FedEx charges, utilities, certain employees.  Third, the Debtor made payments directly to insiders who perpetrated the fraudulent scheme:  Mr. Mayfield, Mr. Wright and his entities such as AWB, Mr. Micheletti, Ms. Adjangba, Dr. Mukathe.  Fourth, the Debtor made payments to third parties to pay expenses owed by other third parties, typically Mr. Mayfield's family members and insiders:  apartment rent, car leases, private school tuition.

41.      Next, the Trustee reviewed applicable defenses that apply in the context of Ponzi scheme cases in the U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit").  Here, the Debtor's operations qualified as a Ponzi scheme as articulated by the Ninth Circuit in In re Agricultural Research Technology Group, 916 F.2d 931 (9th Cir. 1990) because it was an arrangement whereby the Debtor made payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as investors expected.  This gave investors the impression that a legitimate profit making business opportunity existed, where in fact no such opportunity existed.  Once a Ponzi scheme is found to exist, all transfers made in connection with that Ponzi are

1  deemed fraudulent, as all such transfers are made for the purpose of reinforcing the illusion

2  that the Ponzi is a legitimate investment vehicle and thus, encouraging additional

3  investment into the scheme.  AFI Holding, Inc. v. Mackenzie, 525 F.3d 700, 704 (9th Cir.

4  2008).  However, transferees may possess a defense if they received the transfers in good

5  faith and in exchange for value.  The Ninth Circuit in Donell v. Kowell, 533 F.3d 762 (9th

6  Cir. 2008) stated that for defrauded investors there is a "netting" of the principal invested

7  against amount received from the Ponzi--the balance is an avoidable transfer.

8      42.    For this reason, the Trustee evaluated, in the case of each transferee, whether

9  that transferee gave value to the Debtor, whether the transferee gave value in good faith,

10  and for each investor, whether that investor received more than they invested with the

11  Debtor.  The Trustee mailed approximately 120 demand letters to transferees, including

12  Mr. Wright, and received numerous responses which the Trustee also analyzed—including

13  a response from Mr. Wright--to determine whether an avoidance action should be brought.

14      43.    After performing this analysis, the Trustee determined that an avoidance

15  action should be brought against Mr. Wright and other affiliates of Mr. Wright including

16  AWB, to avoid and recover the Initial Transfers.  The Trustee commenced the Wright

17  Adversary on June 5, 2023.  In the Wright Adversary, the Trustee asserts that certain

18  transfers to Mr. Wright and his companies, including the Initial Transfers, are avoidable

19  under 11 U.S.C. §§544 and 548.

20      44.    The Trustee, as part of its investigation into the Initial Transfers, obtained a

21  copy of Mr. Wright's bank statements at Wells Fargo including Account 7496.  The

22  Trustee reviewed transfers made out of that account, and determined that Defendant

23  received the Four-Year Transfers.  Pursuant to 11 U.S.C. §550(a)(2), to the extent the

24  Initial Transfers are avoided as fraudulent transfers, the Trustee can recover the property

25  transferred or value thereof not only from the initial transferee or person for whose benefit

26  the transfer was made (here, Mr. Wright and Ms. Wright) but from "any immediate or

27  mediate transferee of such transferee."  There is an exception that applies to transferees

28  who meet the requirements of 11 U.S.C. §550(b):  if a transferee takes for value and in

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1  good faith (or is a later transferee of someone who does), then the Trustee cannot recover

2  that avoided transfer.

3      45.     The Defendant did not take the Four-Year Transfers for value.  At the time

4  AWB made the Four-Year Transfers to Defendant, AWB owed Defendant nothing.  AWB

5  instead paid a debt it did not owe—the debt of Mr. Wright and Ms. Wright on their lease

6  with Defendant.  Certain checks identified that lease by name in the memo line, specifying

7  that Mr. Wright and Ms. Wright were the lessee.  Defendant knew that AWB was paying a

8  debt it did not owe, and kept the Four-Year Transfers anyway.  For that reason, the Four-

9  Year Transfers may be recovered against Defendant.

10     **IV.  The Transfers**

11     46.     In the two-year period prior to the Petition Date, from August 11, 2019, to

12  August 10, 2021 (the "Two-Year Period"), the AWB made the following payments to

13  Defendant out of Account 7496—in the incorrectly-written name "Bahnu Patel":

14          September 5, 2019            $3,180

15          October 5, 2019             $3,180

16          November 3, 2019            $3,180

17          January 6, 2020             $3,240

18          February 5, 2020            $3,240

19          March 6, 2020               $3,340

20          April 8, 2020               $3,240

21          May 7, 2020                 $3,240

22          July 8, 2020                $3,240

23          August 7, 2020              $3,240

24          September 9, 2020           $3,240

25          October 8, 2020             $3,240

26          November 10, 2020           $3,240

27          December 7, 2020            $3,240

28          January 11, 2021            $3,240

**GREENSPOON MARDER LLP**
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

| | |
|---|---|
| February 9, 2021 | $3,240 |
| March 9, 2021 | $3,240 |
| April 9, 2021 | $3,240 |
| May 8, 2021 | $3,240 |
| June 9, 2021 | $3,240 |
| July 8, 2021 | $3,240 |
| August 6, 2021 | $3,240 |
| <u>October 12, 2021</u> | <u>$3,240</u> |
| Total: | $74,440 |

47.  In the four-year period prior to the Petition Date, from August 11, 2017, to August 10, 2021 (the "<u>Four-Year Period</u>"), AWB made payments to Defendant (again in the incorrectly-written name "Bahnu Patel", from checks written from Account 7496, in the total amount of $138,570 (the "<u>Four-Year Transfers</u>").

48.  The Four-Year Transfers consist of the Two-Year Transfers, plus the following transfers:

| | |
|---|---|
| October 4, 2017 | $3,060 |
| November 5, 2017 | $3,060 |
| December 4, 2017 | $3,060 |
| February 5, 2018 | $1,960 |
| May 7, 2018 | $3,110 |
| June 5, 2018 | $3,120 |
| July 6, 2018 | $3,120 |
| August 4, 2018 | $3,120 |
| September 6, 2018 | $3,120 |
| October 5, 2018 | $3,120 |
| October 6, 2018 | $3,120 |
| December 4, 2018 | $3,120 |
| January 4, 2019 | $3,120 |

| | | |
|---|---|---|
| 1 | February 6, 2019 | $3,120 |
| 2 | March 5, 2019 | $3,180 |
| 3 | April 5, 2019 | $3,180 |
| 4 | May 5, 2019 | $3,120 |
| 5 | June 4, 2019 | $3,180 |
| 6 | July 4, 2019 | $3,180 |
| 7 | <u>August 6, 2019</u> | <u>$3,180</u> |
| 8 | Total | $64,170 |

49.     As alleged in the Wright Adversary, the Initial Transfers are avoidable as intentionally fraudulent.  Mr. Wright was the primary salesperson at the Debtor.  His role was to get investors to deposit their investments into Account 0438.  He did not provide value, because the only value the Debtor obtained from millions of dollars of investments was debt it could never repay.  Outside of the members of Mr. Mayfield's family, Mr. Wright was the primary beneficiary of the Debtor's fraud.  He is also the insider who appears to have taken the most pains to cover his tracks, using an alter ego at the Debtor, taking payments not in his own name, and creating multiple entities under his control to be the transferees of payments initially made by the Debtor to Enumah, AWB, and himself through various dbas.  He did not take the Initial Transfers in good faith.

50.     The Four-Year Transfers are recoverable against Defendant because the Defendant is a subsequent transferee of the avoidable Initial Transfers, and does not meet the exceptions identified in 11 U.S.C. §550(b).   Mr. Wright and Ms. Amy Barrows-Wright owed Defendant money to lease the Valerio Property.  AWB paid that lease.  At the time AWB made those payments, it owed Defendant nothing.

**V.     Badges Of Fraud Related To The Initial Transfers**

51.     Multiple badges of fraud are present with respect to the Initial Transfers, including the following:

- The Debtor was a Ponzi scheme during its entire existence, as substantially all money generated by the Debtor's operations came from new investments,

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

instead of regular business operations.  The Debtor solicited investments from investors at a time when its revenue source from customers paying for internet usage was minimal, and not sufficient to pay general operating expenses.  Further, investor deposits only burdened the Debtor with significantly more debt that it could not repay.  This meant that the Debtor was required to enter into more and more fraudulent transactions in order to pay for prior obligations;

- The Debtor was insolvent during the Four-Year Period;

- The Debtor had incurred, and was continuing to incur, substantial debt at the time the Initial Transfers were made;

- The Initial Transfers were made while the Debtor was under threat of potential lawsuits.  Had the Debtor's investors discovered the fraud, the Debtor and its principals would have been subject to numerous lawsuits.  Certain of the Debtor's investors did pressure the Debtor to make payments, including buying back the antennas, after discovering the fraud, and in some instances including Mr. Thieman actually filed suit;

- The Debtor removed and concealed assets.  Mr. Mayfield transferred investor money from the Debtor's accounts to himself, his family members, and other insiders to fund a lavish lifestyle, including purchasing the Anaheim Property.  The Debtor attempted to conceal the purpose of the Initial Transfers by transferring them an entity not in the name of Mr. Wright—AWB—but all for the benefit of Mr. Wright, who received no transfers in his own name during the Four-Year Period.

- The Debtor made the Initial Transfers for less than reasonably equivalent value;

- The Debtor made false statements, concealed facts, and operated under false pretenses.  Among other things, the Debtor made misrepresentations concerning the following: (a) its financial condition; (b) its contractual

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

relationships with property owners including, specifically, leases of property where an investor-purchased antenna was to be placed, (c) its ownership of physical items such as antennas, and (d) its revenue from customers.

- The Initial Transfers were made to an insider, Mr. Wright, who was the primary beneficiary of the Debtor's Ponzi scheme outside of Mr. Mayfield's family.

- The Debtor was aware of investor deposits with the company and was aware that it was incapable of paying those investors back.

### FIRST CLAIM FOR RELIEF

### (Recovery Of Transfers Or The Value Thereof Pursuant To 11 U.S.C. § 550)

52.    The Trustee realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as though set forth in full.

53.    Defendant is the immediate transferee of the Initial Transfers, in the total amount of the Four-Year Transfers--$138,570.

54.    The Four-Year Transfers are recoverable from Defendant as the immediate or mediate transferee of the Initial Transfers that the Debtor made with the actual intent to hinder, delay, or defraud its creditors, including those creditors who are listed in the Debtor's schedules as holding undisputed claims or who have filed proofs of claim against the Estate.

55.    To the extent the Initial Transfers are avoided, the Trustee may recover, for the benefit of the Estate, the Four-Year Transfers, or, if the Court so orders, the value of the Four-Year Transfers.

**FOR THESE REASONS**, the Trustee prays for judgment against Defendant as follows:

### ON THE FIRST CLAIM FOR RELIEF

1.    To the extent any of the Initial Transfers are avoided, for a judgment that the Trustee may recover from the Defendant, for the benefit of the Estate, such transfers, or, if the Court so orders, the value of such transfers, under 11 U.S.C. § 550(a);

1    2.      For interest as permitted by law from the date of the Four-Year Transfers;

2  and

3    3.      For costs of suit incurred, including attorney's fees.

4  DATED:  October 10, 2023      **GREENSPOON MARDER LLP**

By: _____
    Steven F. Werth
    Attorneys for Howard M. Ehrenberg, Chapter 7 Trustee

GREENSPOON MARDER LLP
1875 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1875 Century Park East, Suite 1900, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (*specify*): **FIRST AMENDED COMPLAINT TO RECOVER AVOIDABLE TRANSFERS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/10/23 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Howard M Ehrenberg (TR) ehrenbergtrustee@gmlaw.com, ca25@ecfcbis.com;
  C123@ecfcbis.com;howard.ehrenberg@ecf.courtdrive.com;Karen.Files@gmlaw.com
- Mark S Horoupian on behalf of Trustee Howard M. Ehrenberg
  mark.horoupian@gmlaw.com,
  mhoroupian@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com;karen.files@gmlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Steven Werth on behalf of Trustee Howard M. Ehrenberg
  steven.werth@gmlaw.com, swerth@ecf.courtdrive.com;
  pdillamar@ecf.courtdrive.com,Karen.Files@gmlaw.com;patricia.dillamar@gmlaw.com

☐ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 10/10/23 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Bhanu V. Patel
aka Bahnu Patel, an individual,
23130 Valerio Street
West Hills, CA 91303

The Honorable Vincent P. Zurzolo
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1368
Los Angeles, CA 90012

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
(state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 10/    /23, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

PMD 55619103v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/10/23 | Patricia Dillamar | /s/Patricia Dillamar |
|----------|-------------------|----------------------|
| Date | Printed Name | Signature |

PMD 55619103v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                    **F 9013-3.1.PROOF.SERVICE**